MATTISON ASHER,  )
  )
    Plaintiff,  )
  )      NO. 3:25-cv-01057
v.  )
  )      JUDGE RICHARDSON
0XBOW LTD., et al.,  )
  )
    Defendants.  )
  )

---

ZAK COLE, et al.,  )
  )
    Counter-Plaintiffs,  )
  )      NO. 3:25-cv-01057
v.  )
  )      JUDGE RICHARDSON
MATTISON ASHER,  )
  )
    Counter-Defendant.  )
  )

## MEMORANDUM OPINION AND ORDER

Pending before the Court is the motion to dismiss (Doc. No. 19, "Motion") filed by 0xbow Ltd. ("0xbow"),[1] Zak Cole ("Cole"), Drew Osumi ("Osumi"), and Patrick McGowan ("McGowan," and collectively with 0xbow, Cole, and Osumi, "Defendants").[2] Via the Motion,

---

[1] The Court notes for clarity that, in what appears to be a stylistic flourish, "0xbow" is spelled with a zero (rather than the capital letter "O.").

[2] Cole and 0xbow are also each counter-plaintiffs in this action. For the sake of brevity, however, the Court herein will refer to 0xbow, Cole, Osumi, and McGowan collectively as simply "Defendants." Additionally, the Court notes that at times it will refer to Cole, Osumi, and McGowan collectively as the "individual Defendants" to distinguish them from the other defendant in this action, 0xbow, which is a legal entity.

  Plaintiff also brought claims against unidentified "Does 1-10." (Doc. No. 1 at 1). References herein to "Defendants" are references solely to the (four) named defendants in this action, namely 0xbow, Cole, Osumi, and McGowan and not also to "Does 1-10."

which is supported by an opening brief (Doc. No. 20, "Opening Brief"), Defendants seek the dismissal of the complaint (Doc. No. 1, "Complaint") of Plaintiff, Mattison Asher,[3] for failure to state a claim. Plaintiff has filed a response (Doc. No. 21, "Response") in opposition to the Motion.

For the reasons stated herein, the Motion (Doc. No. 19) is **DENIED** in its entirety.

BACKGROUND[4]

1. **The Parties**[5]

Plaintiff is an individual residing in Las Vegas, Nevada. (Doc. No. 1 at ¶ 1). Plaintiff is an "entrepreneur and investor in the cryptocurrency ("crypto") industry, with over 9 years of experience." (*Id.* at ¶ 9).

0xbow is "a Delaware corporation with its principal place of business in Nashville, Tennessee." (*Id.* at ¶ 2). Cole, Osumi, and McGowan are individuals residing in Nashville, Tennessee. (*Id.* at ¶¶ 3-5).

2. **Alleged Facts**

In 2023, Plaintiff "became acquaintances with Cole," (Doc. No. 1 at ¶ 10), who at the time was working on "an open-source project called 'Privacy Pools,' which was a privacy protocol

---

[3] Mattison Asher is not only the (sole) plaintiff in this action, but also a counter-defendant. For the sake of brevity, the Court herein will refer to Mattison Asher simply as "Plaintiff."

[4] The facts herein are taken from the Complaint. For purposes of the instant Motion, the facts in the Complaint are accepted as true, except to the extent that they are qualified herein (as, for example, by "Plaintiff alleges") to denote that they are not being taken as true but instead are set forth merely to make clear what a party claims to be true. Throughout this opinion, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even though it is aware that any such (alleged) fact ultimately might not prove to be true.

[5] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page __ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document. In addition, where the Complaint is cited herein without including a paragraph symbol, the citation is not to a paragraph number but rather to a page that contains the cited content outside the boundaries of any paragraph.

designed to make cryptocurrency transactions anonymous." (*Id.* at ¶ 11 (footnote omitted)).[6] Cole "described Privacy Pools as appealing to users that wanted blockchain privacy akin to that offered by TornadoCash."[7] (*Id.* at ¶ 12). "As [Plaintiff] become (sic) more familiar with the Privacy Pools protocol, he saw an untapped opportunity." (*Id.* at ¶ 14).

Around October 2023, Plaintiff shared an idea "with Cole [] that they should build a compliance product around [P]rivacy [P]ools." (*Id.* at ¶ 15). As conceived by Plaintiff, this compliance product would "optimize the Privacy Pools in a number of ways, including that it would monitor funds going into the Privacy Pools, satisfy [] evolving compliance requirements, and enhance protections to help prevent nefarious actors from participating in the Privacy Pools protocol and help prevent illicit funds from becoming commingled in the protocol." (*Id.*).

In October 2023, "Cole told [Plaintiff] that he was interested in partnering on this new [product] with [Plaintiff] and several others." (*Id.* at ¶ 16). On October 11, 2023, "there was a lunch meeting to discuss this new company. Cole, [Plaintiff], Osumi and McGowan participated." (*Id.* at ¶ 17). At that meeting, the participants—seemingly (although the Complaint is not explicit on this point) comprising only Cole, Plaintiff, Osumi, and McGowan—"agreed that they would start a new for-profit company to build the compliance product that [Plaintiff] had conceived [and] that [Plaintiff] and the other co-founders would receive an equal share of ownership in the company." (*Id.*).[8] "When accounting for all of the founders [of the company]"—i.e., seemingly

---

[6] Plaintiff defines an open-source project as—and presumably uses that term in the Complaint to mean— "a software or product where the source code, design documents, or content are made available for anyone to use, study, modify and distribute." (Doc. No. 1 at ¶ 11 n.2).

[7] TornadoCash is an "open[-]source cryptocurrency 'tumbler' that takes digital currency that has become traceable to its source and essentially launders it so that it once again becomes untraceable." (Doc. No. 1 at ¶ 13).

[8] Although Plaintiff does not specify their identities explicitly, the Court discerns that the founders/co-founders (terms which Plaintiff seems to use interchangeably, and which the Court will use interchangeably

only Cole, Plaintiff, Osumi, and McGowan—"this ownership share in the company came out to be 12.3% [per founder] on a fully-diluted basis." (*Id.*).[9] With respect to specifically Plaintiff's share in the new company,[10] Plaintiff was to be given his 12.3% share in this company in exchange for his "contributions in conceptualizing the company's product and direction, and to incentivize [Plaintiff] to continue providing services." (*Id.* at ¶ 24).[11]

Around the same time, "the co-founders agreed that the new company that would develop this compliance product would be called 0xbow." (*Id.* at ¶ 18).[12] In line with the "agreement for an ownership interest in the new company and the clear acknowledgement of imminent incorporation, [Plaintiff] drafted technical and conceptual specifications for the compliance product and shared those specifications with his co-founders." (*Id.* at ¶ 19). Plaintiff also began "working with the 0xbow engineers that would be developing the [] product [and] participated in

---

herein) of this new company (i.e., 0xbow) were (solely) Cole, Plaintiff, Osumi, and McGowan. Conceivably there could be additional founders/co-founders aside from these four individuals, but the Complaint does not identify any other founders/co-founders, and so for the purposes of its discussion herein, the Court understands that the founders/co-founders comprised solely Cole, Plaintiff, Osumi, and McGowan.

[9] Plaintiff does not define the term "fully-diluted basis" or explain why the collective ownership share of the four founders (at 12.3% per founder) in 0xbow accounts for ownership of only 49.2% of 0xbow in total; he likewise does not explain how (or by whom) the other 50.8% is owned.

[10] As discussed below, the contemplated new company ultimately was formed; that company is 0xbox.

[11] The agreements made on October 11, 2023, appear to collectively constitute the contract at issue in this action. (*See e.g.,* Doc. No. 1 at ¶ 24). The Court will refer to this alleged contract as the "At-Issue Contract" herein. Although the Court refers to this alleged contract as the "At-Issue Contract," that does not mean that the Court is accepting as true that the At-Issue Contract was in fact an *enforceable* contract or even a contract at all.

Additionally, although the Complaint is not clear on this point, the parties appear to agree that the At-Issue Contract in this action (to the extent that the At-Issue Contract *is* a contract) is an oral contract. (Doc. No. 20 at 8; Doc. No. 21 at 4).

[12] Plaintiff at times refers to the product that the founders/co-founders planned for 0xbow to develop as the "0xbow product." To avoid confusion between the "0xbow product" and "0xbow" (the business entity and defendant), the Court will herein—consistent with other allegations in the Complaint—refer to the product that the founders/co-founders contemplated 0xbow developing as the "product," the "compliance product," or the "company's product."

numerous strategic discussions with his co-founders and key developers, discussing product/market fit, go-to-market strategy, and potential regulatory implications of the [] product." (*Id.*). Plaintiff engaged in this conduct "based on the agreement that he would receive the specified share of the company's equity on a fully-diluted basis." (*Id.*).

As the development of the new compliance product continued, "unilateral decisions [related to the management of 0xbow], such as appointing Cole's father, Joseph Cole, as an executive, [] were made without the input of [Plaintiff]." (*Id.* at ¶ 20). Plaintiff expressed concern about this appointment, as well as certain decisions made by the engineering team at 0xbow, but his concerns were not addressed. (*Id.*). Ultimately, Plaintiff "decided to take a step back from day-to-day operations at 0xbow" but did not "waive, release, or transfer his ownership interest in 0xbow." (*Id.*).

"Cole, Osumi and McGowan subsequently incorporated 0xbow as a Delaware corporation but failed to reflect [Plaintiff's] 12.3% ownership interest on a fully diluted basis in 0xbow's capitalization table or other corporate records." (*Id.* at ¶ 21). Plaintiff "asked 0xbow and Cole to grant him his ownership interest," but "[t]hey have failed to do so and have disavowed that interest." (*Id.* at ¶ 22).

<u>PLAINTIFF'S CLAIMS AND THE MOTION</u>

Based on the forgoing, Plaintiff brings two claims. The first (Count I) is a claim for breach of contract brought against all Defendants. Via Count I, Plaintiff alleges that the At-Issue Contract is a valid and enforceable contract. (Doc. No. 1 at ¶ 24).[13] Plaintiff further alleges that he fully

---

[13] The At-Issue Contract, as discussed above, involved an agreement among Plaintiff, Cole, Osumi and McGowan to form a company (in which they were to be given equal ownership shares), which was to develop the compliance product conceptualized by Plaintiff. (Doc. No. 1 at ¶ 17). Plaintiff's 12.3% share in the new company (i.e., 0xbow) was to be given to Plaintiff in exchange, as discussed elsewhere herein, for Plaintiff's contributions "in conceptualizing the company's product and direction, and to incentivize [Plaintiff] to continue providing services." (*Id.* at ¶ 24).

performed under the At-Issue Contract, (*id.* at ¶ 25), and that "Cole, Osumi and McGowan materially breached the [At-Issue Contract] by forming 0xbow without reflecting [Plaintiff's] 12.3% ownership interest on a fully-diluted basis in [0xbow]." (*Id.* at ¶ 26). Plaintiff additionally alleges that "0xbow was aware of the terms of the pre-incorporation contract [(i.e., the At-Issue Contract)] and knowingly accepted the benefits of [Plaintiff's] contributions and services" and that "0xbow therefore adopted, assumed and impliedly ratified the pre-incorporation contract." (*Id.* at ¶ 27).

The second claim (Count II) is a claim for unjust enrichment brought against all Defendants, which Plaintiff brings in the alternative to his breach of contract claim in Count I.[14] Via Count II Plaintiff alleges that "if there is no valid and enforceable contract [whereby] Plaintiff would receive [a] 12.3% [ownership interest in] 0xbow, [then] all individual defendants and 0xbow itself were unjustly enriched by [Plaintiff's] valuable contributions and services." (*Id.* at ¶ 31). Plaintiff specifically alleges that given the circumstances described in the Complaint, "all parties reasonably understood that [Plaintiff] would receive compensation for his contributions and services" (*id.* at ¶ 32) and that "[a]llowing [D]efendants the benefits of [Plaintiff's] contributions and services without compensation is unjust." (*Id.* at ¶ 33).

Defendants contend that each of Plaintiff's claims should be dismissed for failure to state a claim. Defendants argue in the Opening Brief, with respect to Count I, that the Complaint fails to show that the At-Issue Contract is an enforceable contract because (according to Defendants): (1) the essential elements of the At-Issue Contract are "ambiguous or indefinite" so as to render

---

[14] As this Court has observed in the past, "a plaintiff can alternatively plead a claim for breach of contract and for unjust enrichment; the plaintiff can allege that there was a valid contract that was breached and, alternatively assuming that there was no contract (or at least no enforceable contract), that there was unjust enrichment." *PSC Indus., Inc. v. Johnson*, No. 3:19-CV-00362, 2021 WL 1663574, at *22 n.36 (M.D. Tenn. Apr. 28, 2021).

the At-Issue Contract unenforceable, (Doc. No. 20 at 8-9), and (2) "[the At-Issue Contract] lacks consideration because the benefit [that Plaintiff was to receive under the At-Issue Contract] is premised on an illusory promise [by Plaintiff]." (*Id.* at 9). Defendants argue in the Opening Brief, with respect to Count II, that the Complaint fails to state a claim for unjust enrichment because "Plaintiff fails to adequately plead how any of the [D]efendants benefitted." (Doc. No. 20 at 10). In his Response, Plaintiff takes issue with each of these arguments, as will be discussed below.

LEGAL STANDARD

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*. at 678; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendants' liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id*. at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

<u>DISCUSSION</u>

Following the sequencing of Defendants' arguments in their Opening Brief, the Court first will examine whether Count I (breach of contract) should be dismissed. The Court then will examine whether Count II (unjust enrichment) should be dismissed.

### 1. Count I: Breach of Contract

As an initial matter, the parties mutually assert that Tennessee law is the substantive law applicable to both claims asserted in the Complaint.[15] (Doc. No. 20 at 7 n.3; Doc. No. 21 at 6, 12). The Court agrees and will proceed accordingly. Under Tennessee law,[16] the elements of a breach

---

[15] The Court notes that Plaintiff premises subject-matter jurisdiction over this action solely on 28 U.S.C. § 1332(a), that is, based on diversity of citizenship of the parties. (Doc. No. 1 at ¶ 6).

[16] The Court notes that in citing cases herein to identify or explain its view as to what Tennessee law is on a particular topic or issue, the Court is mindful of the so-called *Erie* doctrine, whereby the Court should not necessarily accept that a court's prior statement of Tennessee law accurately reflects current Tennessee law. (Notably, at times the Court cites cases that purport to state Tennessee law, but does so for some purpose other than to identify or explain *the Court's view* as to what current Tennessee law is—for example, in order to note a particular view of some aspect of Tennessee law that is held by some courts but not necessarily by other courts and not necessarily by the undersigned judge of this Court).

of contract claim are: "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of contract, and (3) damages caused by the breach of the contract." *Tennessee Homes v. Welch*, 664 S.W.3d 1, 8 (Tenn. Ct. App. 2022) (quoting *Fitness & Ready Meals LLC v. Eat Well Nashville LLC*, No. M2021-00105-COA-R3-CV, 2022 WL 601073, at *3 (Tenn. Ct. App. Mar. 1, 2022)).

Given that the At-Issue Contract appears to be an oral contract,[17] the Court first will elucidate some general principles about oral contracts. Under Tennessee law, an oral contract is

---

The *Erie* doctrine was announced in *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). "Under the *Erie* doctrine, a federal court sitting in diversity applies 'the substantive law of the forum state and federal procedural law.'" *Bonasera v. New River Elec. Corp.*, 518 F. Supp. 3d 1136, 1151 (S.D. Ohio 2021) (quoting *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)).
The Sixth Circuit has explained:

> In diversity cases such as this, [the *Erie* doctrine requires that] we apply state law in accordance with the controlling decisions of the state supreme court. If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data. "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the [state] Supreme Court would decide otherwise."

*Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) (citations and footnote omitted) (quoting *Kingsley Assoc. v. Moll PlastiCrafters, Inc.,* 65 F.3d 498, 507 (6th Cir.1995)). Putting things somewhat differently, the Sixth Circuit recently has said:

> When applying state law, we must follow the controlling decision of the highest state court. If no such decision controls, we follow a decision of the state appellate court, published or unpublished, unless we are convinced that the highest court of the state would decide otherwise.

*Boyd v. N. Biomedical Rsch., Inc.*, 165 F.4th 424, 435 (6th Cir. 2026) (citations, quotation marks, and ellipsis omitted).
Herein, when the Court cites a decision of the Tennessee Court of Appeals (or, for that matter, a decision of the Tennessee Supreme Court or a federal court) stating a purported proposition of Tennessee law, it does so with confidence that the Tennessee Supreme Court today would not decide differently with respect to the statement.

[17] Although the Complaint is not clear on this point, neither Plaintiff nor Defendants contest that the At-Issue Contract is an oral contract, and so the Court will treat the At-Issue Contract as an oral contract herein. (Doc. No. 20 at 8; Doc. No. 21 at 4).

enforceable[18] if: "(1) the parties mutually assented to the terms of the contract, and (2) these terms are sufficiently definite to be enforceable."[19] *Henrick v. Mealor*, No. 3:18-cv-00621, 2020 WL 1676913, at *6 (M.D. Tenn. Apr. 6, 2020) (citing *Burton v. Warren Farmers Co-op.,* 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002)). Like any contract, an oral contract requires consideration. *See e.g., Sanderson v. Anderson*, No. CA 1207, 1988 WL 132667, at *3 (Tenn. Ct. App. Dec. 14, 1988)

---

[18] Notably, whether a contract is *enforceable* is a somewhat different question from whether a contract *exists*. Indeed, in evaluating whether a contract *exists*—as distinguished from whether that contract is *enforceable*—Tennessee courts regularly find that there is *no* contract where the terms of a purported contract are insufficiently definite, *see e.g., Johnson v. Lefeve,* No. M2024-01484-COA-R3-CV, 2026 WL 523193, at *7 (Tenn. Ct. App. Feb. 25, 2026) ("If the essential terms of an alleged agreement are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract" (quoting *Earls v. Blankenship*, No. W2009-01959-COA-R3-CV, 2010 WL 3210751, at *8 (Tenn. Ct. App. Aug. 16, 2010))), *appeal denied* (June 23, 2026), or where a purported contract is not supported by consideration. *See, e.g., Hopewell Baptist Church v. Se. Window Mfg. Co., LLC*, No. E2000-02699-COA-R3CV, 2001 WL 708850, at *6 (Tenn. Ct. App. June 25, 2001) ("Since there is no consideration, there is no contract implied in law or in fact."). For this reason, it is inapt under Tennessee law to refer to a contract as being unenforceable due to insufficient definiteness; the reference instead should be to a mere *purported* contract being unenforceable (and indeed actually *nonexistent*) due to insufficient definiteness.

Nevertheless, in discussing herein whether the terms of the At-Issue Contract are sufficiently definite and whether the At-Issue Contract is supported by consideration, the Court speaks in terms of whether that (purported) contract is *enforceable* rather than in terms of whether that (purported) contract is actually a contract (i.e., actually ever existed as a contract). The Court does so for two reasons. First, the parties generally do so. And second, courts discussing breach of contract claims under Tennessee law generally discuss the first element of a breach of contract claim in terms of whether there is an *enforceable* contract rather than in terms of whether a contract *exists*. *See e.g., Welch*, 664 S.W.3d 1 at 8.

But to be clear, it is likely more accurate to say that herein the Court is really evaluating whether Plaintiff has presented sufficient factual matter to have shown (consistent with the discussion in a footnote below), in the Court's eyes, the *existence* of a contract.

[19] The Court realizes that the second requirement is framed in rather circular terms, especially if one recognizes that a contract *is* its terms (i.e., that the contract is composed exclusively of its terms). Per the second requirement as thus framed, a contract is enforceable if its terms are sufficiently definite to be enforceable; in other words, a contract is enforceable if it is sufficient (as to its definiteness) to be enforceable—which sounds a lot like saying that a contract is enforceable if it is enforceable (considering the sufficiency of its definiteness). A non-circular way of stating this requirement would be to say that a contract is enforceable if it reaches a particular degree of definiteness and then describe the particular degree of definiteness required (to the extent that a particular degree of definiteness actually can be described). But the Court takes this requirement as it is written.

("A written or oral agreement requires consideration to support it." (citing *Clark v. Small,* 14 Tenn. 418 (1834))).[20]

With those principles in mind, the Court will now turn to Defendants' arguments in favor of dismissal of Count I. Defendants contend that the first element of a claim for breach of contract—that there be an enforceable contract—has not been shown by the Complaint's allegations because (according to Defendants): (1) the essential elements of the At-Issue Contract are "ambiguous or indefinite" so as to render the At-Issue Contract unenforceable, (Doc. No. 20 at 8-9), and (2) "[the At-Issue Contract] lacks consideration because the benefit [that Plaintiff was to receive under the At-Issue Contract] is premised on an illusory promise [by Plaintiff]." (*Id.* at 9). The Court will address each of these arguments in turn.

> a.  *Whether the Terms of the At-Issue Contract Were Sufficiently Definite*

When examining whether the terms of a contract are sufficiently definite so as to render a contract enforceable, Tennessee courts have observed that a contract's terms are sufficiently

---

[20] Importantly, whether a contract is enforceable is a question of law for the Court, and not for a jury, to decide. *See e.g., Petersen v. Genesis Learning Centers*, No. M2004-01503-COA-R3CV, 2005 WL 3416303, at *4 (Tenn. Ct. App. Dec. 13, 2005) ("Whether the parties entered into an enforceable contract is a question of law."); *Bailey v. Am. Gen. Life & Acc. Ins. Co.*, No. M2003-01666-COA-R3CV, 2005 WL 3557840, at *6 (Tenn. Ct. App. Dec. 29, 2005) ("Therefore, Tennessee contract law governs whether the agreement [] is too vague and indefinite to be enforceable. That is a question of law." (footnote omitted)); *Jackson v. Maine Pointe, LLC*, No. 3:16-CV-604, 2018 WL 1371488, at *3 (E.D. Tenn. Mar. 16, 2018) ("Finally, it is well established that the determination of whether an enforceable contract has been formed is a question of law." (citing *Grace v. Grace*, 2016 WL 6958887 at *3 (Tenn. Ct. App. Oct. 26, 2016); *German v. Ford*, 300 S.W.3d 692, 701 (Tenn. Ct. App. 2009))). *See also Thorne v. Satellogic USA, Inc.*, No. 3:23-CV-00619, 2024 WL 1558707, at *5 (M.D. Tenn. Apr. 9, 2024) ("The Court does not dispute Defendant's contention that to be enforceable, a contract must include sufficiently definite terms to allow a reviewing court to ascertain the parties' respective obligations.").

With this in mind, the Court discerns that its job here in connection with Count I is to determine whether *the Court itself actually finds* that the Complaint alleges facts that are (taken as true) sufficient, in the *Court's view*, to *show* (at least to the Court's satisfaction) the existence of an enforceable contract. Notably, this is somewhat different from the more typical job that a court has, under *Iqbal* and *Twombly,* on a motion to dismiss for failure to state a claim: determine whether the complaint alleges facts sufficient to *plausibly suggest* the elements of a claim such that *a jury could find* that those elements exist based on those alleged facts.

definite where those terms permit a court to "perceive what are the respective obligations of the parties." *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001) (quoting *Higgins v. Oil, Chem., and Atomic Workers Int'l Union, Local # 3–677*, 811 S.W.2d 875, 880 (Tenn. 1991)). Put another way, a contract's terms are sufficiently definite where they "provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Gamble v. Friend*, No. M2023-01452-COA-R3-CV, 2025 WL 2754530, at *3 (Tenn. Ct. App. Sept. 29, 2025) (quoting *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990)). Importantly, under Tennessee law:

> [t]he determination that a[] [contract] is sufficiently definite [so as to be enforceable] is favored. Therefore, the courts will, if possible so construe the [contract] as to carry into effect the reasonable intention of the parties, if that can be ascertained. The law leans against the destruction of contracts for uncertainty, particularly where one of the parties has performed his part of the contract.

*APCO Amusement Co. v. Wilkins Family Rest. of Am.*, Inc., 673 S.W.2d 523, 528 (Tenn. Ct. App. 1984) (quoting 17 Am. Jur. 2d Contracts § 75 (1964)). *See also Universal Properties, Inc. v. Regions Bank*, No. 3:11-CV-538, 2012 WL 4360770, at *4 (E.D. Tenn. Sept. 21, 2012) ("the actions of the parties may show conclusively that they have intended to conclude a binding agreement . . . An offer which appears to be indefinite may be given precision by usage or trade or by course of dealing between the parties."[21] (quoting *Gurley v. King*, 183 S.W.3d 30, 35 (Tenn. Ct. App. 2005))).

Defendants contend that Plaintiff has not set forth allegations showing that the terms of the At-Issue Contract are sufficiently definite so as for the At-Issue Contract to be enforceable. Defendants specifically argue:

---

[21] The reference here is to an indefinite "offer"; in context, though, the reference applies to an indefinite *contract*, insofar as an offer (to enter into a contract) becomes a contract once it is accepted by the counterparty.

Plaintiff appears to allege that he entered into an oral contract with Defendants whereby he would be given an equity interest in a later-formed company in exchange for his "contributions in conceptualizing the company's product and direction" and "to incentivize [him] to continue providing services." Complaint, ¶ 23. But Plaintiff does not plead the essential elements of this purported contract for services. The Complaint is silent as to the scope and duration of the continued "services" allegedly pledged by the Plaintiff. It is also not possible to ascertain even the date of this purported "contract," as Plaintiff first contends it occurred during an informal lunch discussion on October 11, 2023 (*Id.*, ¶ 17) and later alleges it occurred on October 15, 2023 (*Id.*, ¶ 23). Plaintiff also does not attach or allege that any written documentation exists memorializing this purported agreement. *See In McKnelly v. Wyndham Destinations, Inc.*, No. 3:19-cv-103-TAV-DCP, 2020 WL 1518624, at \*3–\*4 (E.D. Tenn. Mar. 30, 2020) (finding that a plaintiff's failure to attach contracts alleged to be breached is not necessarily fatal but that a complaint must include the language of specific contract provisions allegedly breached and allegations of non-performance that are "vague, naked assertions" did not correspond to a defined contractual obligation).

(Doc. No. 20 at 8).[22] Defendants further assert:

Under Tennessee law, where an essential term of a purported contract is ambiguous or indefinite—here, Plaintiff's purported obligation to provide generic "contributions" and "services"—it is unenforceable. *See e.g., Reaves v. CWS Powder Coatings Co., L.P.*, No. 3:22 CV-00158, 2023 WL 3635704, at \*7 (M.D. Tenn. May 24, 2023), *reconsideration denied*, No. 3:22-CV-00158, 2023 WL 4189657 (M.D. Tenn. June 26, 2023) (quoting *Peoples Bank of Elk Valley v. ConAgra Poultry Co.*, 832 S.W.2d 550, 553 (Tenn. Ct. App. 1991)) ("Indefiniteness as to any essential element of an agreement may prevent the creation of an enforceable contract."); *see also Higgins v. Oil, Chem. & Atomic Workers Int'l Union, Loc.* No. 3-677, 811 S.W.2d 875, 880–81 (Tenn. 1991) (gathering cases finding contracts unenforceable because they lacked definite terms, instead using vague language such as "light work" without any discussion of a specific job, pay, hours, or duration of employment, and making sure an individual was "taken care of").

(Doc. No. 20 at 8-9). Defendants' arguments on this point are unavailing. Indeed—and as Plaintiff argues in his Response—the Complaint sets forth factual allegations that, via the At-Issue Contract, Plaintiff, Cole, Osumi and McGowan agreed (1) "to start a new company [(i.e., 0xbow)]

---

[22] Defendants cite paragraph 23 of the Complaint when referring to allegations made in *paragraph 24* of the Complaint.

Further, to the extent that Defendants argue that the Complaint is unclear as to *when* the At-Issue Contract was formed, this argument is without merit. Indeed, the Complaint is clear that the At-Issue Contract was formed at the October 11, 2023 lunch meeting (Doc. No. 1 at ¶ 17) described by the Court earlier.

to build the product that [Plaintiff] conceptualized" (Doc. No. 21 at 8 (citing Doc. No. 1 at ¶ 17));
and (2) "agreed that [Plaintiff] and the [other] co-founders [(i.e., Cole, Osumi and McGowan)]
would receive equal ownership shares [in the company]." (*Id.*). Further—and again as Plaintiff
argues—the Complaint sets forth factual allegations that, via the At-Issue Contract, Plaintiff
"would contribute his ideas and direction to help the partnership develop his concept into a product
in exchange for an ownership interest in the new entity." (Doc. No. 21 at 8 (citing Doc. No. 1 at ¶
24)).

The upshot is that Plaintiff's allegations, taken as true, show the existence of a contract that
is not unenforceable due to lack of definiteness because, based on his factual allegations, the Court
is able perceive the respective obligations of the parties to the At-Issue Contract. *See HCA Health
Servs. of Tenn., Inc.*, 46 S.W.3d at 196 (contract is sufficiently definite when the court can
"perceive what are the respective obligations of the parties."). Specifically—and again, accepting
Plaintiff's factual allegations as true—under the At-Issue Contract, Plaintiff, Cole, Osumi and
McGowan agreed to form a company (i.e., 0xbow) and were to be given equal ownership interests
in that company, which itself was to develop the compliance product conceptualized by Plaintiff.
(Doc. No. 1 at ¶ 17). Additionally, in return for his 12.3% share in the new company, Plaintiff was
required to make "contributions in conceptualizing the company's product and direction." (*Id.* at
¶ 24).[23]

And although Plaintiff's contractual obligation to make "contributions in conceptualizing
the company's product and direction" may be a somewhat imprecise contractual obligation,
Plaintiff has set forth allegations that he did in fact perform—i.e., make "contributions in

---

[23] That is not to say that the Court is finding *conclusively* that these are the parties' obligations under the
At-Issue Contract. Rather, the Court is merely finding that Plaintiff has set forth allegations allowing the
Court—accepting those allegations as true—to find that Plaintiff has shown (at this stage of the litigation)
the parties' obligations under the At-Issue Contract.

conceptualizing the company's product and direction"—under the At-Issue Contract. (Doc. No. 1 at ¶ 19 ("[In line with] the [] agreement for an ownership interest in the new company and the clear acknowledgement of imminent incorporation, [Plaintiff] drafted technical and conceptual specifications for the compliance product and shared those specifications with his co-founders."). And this (alleged) performance by Plaintiff under the At-Issue Contract further cautions the Court against finding that the At-Issue Contract is unenforceable for lack of definiteness. *See e.g., APCO Amusement Co.*, 673 S.W.2d 523 at 528 ("The law leans against the destruction of contracts for uncertainty, particularly where one of the parties has performed his part of the contract." (quoting 17 Am. Jur. 2d Contracts § 75 (1964))); *Universal Properties, Inc.*, 2012 WL 4360770, at *4 ("An offer which appears to be indefinite may be given precision by usage or trade or by course of dealing between the parties.").

Given the foregoing, the Court concludes that any purported indefiniteness is not a basis to conclude that Plaintiff has not sufficiently alleged an enforceable contract.[24] [25]

---

[24] Defendants argue that "Plaintiff's purported obligation to provide generic 'contributions' and 'services'" is indefinite or ambiguous so as to render the At-Issue Contract unenforceable. (Doc. No. 20 at 9). But this argument does not avail Defendants, given that Plaintiff has alleged that he performed under the At-Issue Contract and provided—as detailed in the body of this memorandum opinion and order—specific services and contributions through that performance. *See e.g., APCO Amusement Co.*, 673 S.W.2d 523 at 528 ("The law leans against the destruction of contracts for uncertainty, particularly where one of the parties has performed his part of the contract." (quoting 17 Am. Jur. 2d Contracts § 75 (1964))); *Universal Properties, Inc.*, No. 3:11-CV-538, 2012 WL 4360770, at *4 ("the actions of the parties may show conclusively that they have intended to conclude a binding agreement . . . An offer which appears to be indefinite may be given precision by usage or trade or by course of dealing between the parties.").

Defendants also rely on *Higgins v. Oil, Chem. & Atomic Workers Int'l Union, Loc. No. 3-677*, 811 S.W.2d 875, 880-81 (Tenn. 1991) for the proposition that vague language such as a promise to do "'light work' without any discussion of a specific job, pay, hours, or duration of employment, and mak[e] sure an individual was 'taken care of,'" can render a contract unenforceable. (Doc. No. 20 at 9). But *Higgns* is distinguishable. First, the portion of *Higgins* on which Defendants rely involves a discussion of employment contracts in particular and therefore is of limited applicability to the instant action. Second, the terms of the At-Issue Contract are much more definite than mere respective commitments by Plaintiff to do light work and by the individual Defendants to "take care of" Plaintiff.

[25] This is not to say that Defendant cannot raise the issue of the At-Issue Contract's definiteness (or lack thereof) at a later stage of this litigation, such as via a motion for summary judgment.

### b. *Whether the At-Issue Contract was Supported by Consideration*

As noted above, Defendants also argue that Count I should be dismissed because (according to Defendants) Plaintiff has not set forth allegations showing that the At-Issue Contract was supported by consideration. (Doc. No. 20 at 9). Just like any contract, an oral contract—like the At-Issue Contract—requires consideration. *See e.g., Sanderson*, 1988 WL 132667, at *3 ("A written or oral agreement requires consideration to support it."). Consideration exists "whenever a party does something that he or she has no legal obligation to do or refrains from doing something that he or she has a legal right to do." *Estate of Brown*, 402 S.W.3d 193, 200 (Tenn. 2013) (citing *Brown Oil Co. v. Johnson*, 689 S.W.2d 149, 151 (Tenn. 1985)). "Any consideration, however small, will support a [contract]." *Danheiser v. Germania Savs. Bank & Trust Co.*, 194 S.W. 1094, 1096 (1917). Importantly, "[m]utual promises are sufficient to constitute consideration." *Brown*, 402 S.W.3d at 200 (citing *Rodgers v. Southern Newspapers, Inc.*, 379 S.W.2d 797, 800 (1964)).

Here, Defendants contend that the At-Issue Contract, as alleged, "lacks consideration because the benefit [that Plaintiff was to receive under the At-Issue Contract] is premised on an illusory promise [by Plaintiff]." (Doc. No. 20 at 9). Defendants specifically argue:

> It is well established that "a promise constitutes consideration for another promise only when it creates a binding obligation." *Walker v. Ryan's Fam. Steak Houses, Inc.*, 289 F. Supp. 2d 916, 929 (M.D. Tenn. 2003), *aff'd*, 400 F.3d 370 (6th Cir. 2005) (quoting *Floss*, 211 F.3d at 315 (citing *Dobbs v. Guenther*, 846 S.W.2d 270, 276 (Tenn. Ct. App. 1992)). Here, Plaintiff contends that his end of the bargain consisted of being "incentivize[d] to continue providing services." Compl., ¶ 23. This is the equivalent of "essentially promising nothing at all, or allowing the promisor to decide whether or not to perform the promised act." *Walker*, 289 F. Supp. 2d at 929. In fact, Plaintiff admits that he did just that by voluntarily withdrawing from the project prior to incorporation. *See*, Compl., ¶¶ 19–20. An illusory promise fails to create an enforceable contract. *See Walker*, 289 F. Supp. 2d at 929.

(Doc. No. 20 at 9).[26] Although this is not the clearest argument, what Defendants seem to be arguing here is that as far as Plaintiff alleges, Plaintiff was *not* required to do *anything* under the At-Issue Contract, because he was required merely to be "incentivize[d]" to continue providing services, rather than to *actually* continue providing services. In other words, according to Defendants, per his own allegations, Plaintiff's promise left him free to provide or not to provide these services as he wished (as long as he was "incentivize[d]" to provide them), and so this was a mere "illusory promise" by Plaintiff and thus incapable of constituting consideration. (Doc. No. 20 at 9).

However, Defendants' argument is unavailing. Accepting *arguendo* Defendants' interpretation that the Complaint sets forth allegations to the effect that Plaintiff was *not* required to "continue providing services" under the At-Issue Contract, Defendants' argument ignores other allegations in the Complaint that (taken as true as required) satisfy the Court that the At-Issue Contract was supported by consideration. The Complaint sets forth factual allegations that Plaintiff was to be given a 12.3% interest in the company specifically in exchange for Plaintiff's "contributions in conceptualizing the company's product and direction." (Doc. No. 1 at ¶ 24). And so, just as Plaintiff argues in his Response, the "Complaint is clear that [] equity in 0xbow [was] in exchange for [Plaintiff's] contribution of his concept and contribution in developing the company's 'product and direction.'" (Doc. No. 21 at 11). For this reason, the Court rejects Defendants' argument that Plaintiff was *not* required to do *anything* under the At-Issue Contract, because Plaintiff was (according to Defendants) required merely to be "incentivize[d]" to continue providing services (Doc. No. 20 at 9).

---

[26] Defendants again cite paragraph 23 of the Complaint when referring to allegations made in *paragraph 24* of the Complaint.

Put another way, the Complaint's allegations show that the At-Issue Contract was supported by consideration. *See Brown*, 402 S.W.3d at 200. So, the Court will not dismiss Count I for a purported lack of consideration, and Count I of the Complaint accordingly will proceed.[27] [28]

### 2. Count II: Unjust Enrichment

Turning to Plaintiff's claim for unjust enrichment in Count II, Tennessee courts consider claims for unjust enrichment (or as it is sometimes known, *quantum meruit*) in terms of either a three-element test or a five-element test. Tennessee courts employing the three-element test require a plaintiff to allege: (1) "[a] benefit conferred upon the defendant by the plaintiff;" (2) "appreciation by the defendant of such benefit;" and (3) "acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (quoting *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 155 (1966)). Courts employing the five-element test require a plaintiff to allege:

> (1) there must be no existing, enforceable contract between the parties covering the same subject matter,
> (2) the party seeking recovery must prove that it provided valuable goods and services,
> (3) the party to be charged must have received the goods and services,
> (4) the circumstances must indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods or services expected to be compensated, and
> (5) the circumstances must also demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them.

---

[27] In passing, Defendants argue that Plaintiff's claim in Count I "fails to meet the basic pleading standards of Rule 8." (Doc. No. 20 at 10). This argument is made without any support, and so the Court will not address it herein. *See e.g., Ruffin v. Cuyahoga Cnty.*, 708 F. App'x 276, 278 (6th Cir. 2018) ("A party may not present a skeletal argument, leaving the court to put flesh on its bones.").

[28] This is not to say that Defendant cannot raise the issue of whether the At-Issue Contract was supported by consideration at a later stage of this litigation, such as via a motion for summary judgment.

*ICG Link, Inc. v. Steen*, 363 S.W.3d 533, 546 (Tenn. Ct. App. 2011) (quoting *Forrest Constr. Co., LLC v. Laughlin*, 337 S.W.3d 211, 227 (Tenn. Ct. App. 2009)). The undersigned recently stated that he is "inclined to recognize the five-element test [] as the precise applicable test that the Tennessee Supreme Court would choose if asked today to choose between the two." *Envision Healthcare Operating, Inc. v. United Healthcare Servs., Inc.*, No. 3:22-CV-00693, 2026 WL 1623108, at *18 (M.D. Tenn. June 4, 2026). But here the Court need not (and so does not) choose conclusively between these two iterations of the test for unjust enrichment, given that Defendants challenge one (and only one) element of Plaintiff's unjust enrichment claim: Defendants' receipt of a benefit from Plaintiff, which essentially is both an element (the third element) of the five-element test and an element (the first element) of the three-element test. As relevant here, with respect to a claim for unjust enrichment, the Tennessee Supreme Court has held that a benefit is "any form of advantage that has a measurable value including the advantage of being saved from an expense or loss." *Freeman Indus., LLC*, 172 S.W.3d at 525 (citing *Lawrence Warehouse Co. v. Twohig*, 224 F.2d 493, 498 (8th Cir.1955)).

> Here Defendants argue:
>
> Plaintiff fails to adequately plead how any of the defendants benefitted. Plaintiff alleges only that "all individual defendants and 0xbow itself were unjustly enriched by [Plaintiff's] valuable contributions and services." Compl., ¶ 30. Such bare and conclusory allegations are insufficient to sustain a claim for unjust enrichment.

(Doc. No. 20 at 10).[29] This argument represents a misreading—whether deliberate or not—of the Complaint. As Plaintiff correctly identifies in his Response, it "follows inevitably from the allegations of the Complaint" that Defendants received a benefit from Plaintiff. (Doc. No. 21 at 12-13). Specifically, the Complaint sets forth factual allegations that the individual defendants

---

[29] Here, although Defendants cite paragraph 30 of the Complaint, they are actually referring to allegations in *paragraph 31*.

(i.e., Cole, Osumi, and McGowan) as the co-founders of 0xbow, as well as 0xbow itself, benefited from—among other things—Plaintiff's concept for the product to be designed by 0xbow (Doc. No. 1 at ¶ 15), Plaintiff's contributions in the form of "technical and conceptual specifications" for the product, (*id.* at ¶ 19), and Plaintiff's participation in "strategic discussions with his co-founders and key developers, discussing product/market fit, go-to-market strategy, and potential regulatory implications of the [] product." (*Id.*). The benefit (i.e., advantage) that Plaintiff conferred on Defendants is obvious. *Freeman Indus., LLC*, 172 S.W.3d at 525 (a benefit is "any form of advantage that has a measurable value including the advantage of being saved from an expense or loss.").

Therefore, the Court will not dismiss Count II of the Complaint for any purported failure of Plaintiff to allege facts plausibly suggesting that Defendants received a benefit from Plaintiff.[30] And so, both Count I and Count II of the Complaint will proceed.

CONCLUSION

Accordingly, the Motion (Doc. No. 19) is **DENIED** in its entirety.[31]

IT IS SO ORDERED.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[30] Importantly, in evaluating a claim for unjust enrichment, "[w]hether a benefit has been conferred and the value of such benefit is a fact question," and so left to the jury. *Bonham Grp. Inc. v. City of Memphis*, No. 02A01-9709-CH-00238, 1999 WL 219782, at *8 (Tenn. Ct. App. Apr. 16, 1999). So in this context—in contrast to the Court's analysis in Count I—the Court is analyzing whether the Complaint *plausibly suggests* the conferral of a benefit such that *a jury could find* that this element exists based on the alleged facts.

[31] To the extent that the Motion requests that the Court award Defendants "attorneys' fees upon further briefing" (Doc. No. 19 at 1), that request is denied as unmeritorious, given that Defendants have provided no basis to be awarded fees and that the Court herein is denying Defendants' request to dismiss the Complaint.